**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dale Speratos, | No. CV 06-1603-PHX-JAT |
| Plaintiff, | **ORDER** |
| vs. | |
| Jo Anne Barnhart, Commissioner of Social Security, | |
| Defendant. | |

Pending before the Court are Plaintiff's Motion for Summary Judgment (Doc. #7) and Defendant's Cross Motion for Summary Judgment (Doc. #14). The Court now rules on the motions.

**I.  Procedural and Factual Background**

Plaintiff Dale Speratos applied for Title II disability insurance benefits on May 28, 2004, alleging a disability onset date of June 1, 2002. (Tr. 46-48). The claim was denied initially and on reconsideration. (Tr. 29-38). On November 28, 2005, upon Plaintiff's request, an administrative law judge (ALJ) held a hearing at which Plaintiff testified. (Tr. 178-200). Sandra Richter, a vocational expert, also testified. On February, 23, 2006, the ALJ denied Plaintiff's claim. (Tr. 13-22). The ALJ found that Plaintiff was not disabled as of September 30, 2003, the date he was last insured for Title II disability benefits. (Tr. 22). The Appeals Council denied review (Tr. 6-8).

Plaintiff, born on March 21, 1949, was 54 years old as of September 30, 2003, the date he was last insured for Title II benefits. (Tr. 21, 46). Plaintiff has a general equivalency

1 degree and past work experience as a drywall finisher and trash hauler. (Tr. 53, 58, 194-
2 195).

3 Plaintiff has Type 2 diabetes for which he takes medication. (Tr. 112, 125, 127). In
4 October 2002, Plaintiff sought treatment at the Scripps Clinic. (Tr. 128, 130). Plaintiff
5 reported sharp foot pain and mild tingling and numbness that began in June or July 2002.
6 (Tr. 123). He had been taking Neurontin, which stopped the shooting pain although the pain
7 tended to return when the medicine wore off. *Id*. At the Scripps Clinic, neurologist John
8 Romine, M.D., evaluated Plaintiff's condition. Dr. Romine noted that Plaintiff's gait,
9 strength and coordination were normal and his muscle strength and reflexes were intact. *Id.*
10 Plaintiff's ankle jerks were sluggish and there was a sensory impairment in the feet. *Id*. Dr.
11 Romine diagnosed sensory polyneuropathy with neuralgic pains, probably diabetic. *Id*. Dr.
12 Romine advised Plaintiff to return to his primary physician concerning control of his
13 diabetes. (Tr. 124).[1] Dr. Romine also recommended that Plaintiff continue taking Neurontin,
14 as Plaintiff was having significant benefit from it. *Id*.

15 On July 21, 2003, Plaintiff sought treatment at the Sharp Rees-Stealy Medical Group
16 for pain in his feet. (Tr. 112). Plaintiff saw John Colson, D.P.M. Dr. Colson gave Plaintiff
17 information on preventive foot care instructions, advised Plaintiff to stop smoking, and
18 instructed Plaintiff on the importance of blood sugar control to prevent complications from
19 diabetes. (Tr. 112-113).

20 In September 2003, Plaintiff visited the Sharp Rees-Stealy Medical Group to discuss
21 disability. (Tr. 117). The chart note states that Plaintiff "decided he was disabled." *Id.*
22 Plaintiff further reported that he worked doing drywall taper, standing and using his arms all
23 day, but that he had not worked for 7 to 8 months in a permanent job. *Id*. Plaintiff
24 complained of shoulder pain, neuropathy, and that he was unable to lift his arms above his

---

[1] Plaintiff's subsequent tests showed that his diabetes was in poor control and that adjustment to medication was needed. (Tr. 133).

- 2 -

1 head. *Id.*

2 On December 17, 2003, Plaintiff saw rheumatologist Cheryl Wright, M.D., who
3 recommended shoulder x-rays. (Tr. 118). The x-rays showed evidence of rotator cuff
4 tendinitis in both shoulders. *Id.* (Tr. 111). Also on December 17, 2003, Plaintiff saw
5 neurologist Scott Riedler, M.D. (Tr. 119-122). Plaintiff reported to Dr. Reidler symptoms
6 of numbness, pain, and weakness in his lower extremities, and that he felt fatigued if he stood
7 for more than two hours. (Tr. 119). Examination showed that Plaintiff had full strength in
8 his upper and lower extremities, and his reflexes were 2+ in biceps and triceps, absent biceps,
9 knees or ankles. (Tr. 120.). Plaintiff experienced some difficulty walking in a straight line
10 while touching the heel of one foot to the toes of the other foot with each step, and had
11 decreased sensation at and below his knees. (Tr. 120). According to Dr. Rielder, Plaintiff's
12 system of two Neurontin and "Juice Plus" worked "fairly well" for him. Dr. Riedler
13 suggested another medication to reduce the pain, but Plaintiff was not interested at that time.
14 (Tr. 120).

15 In July 2004, Stuart Brodksy, D.O., a medical consultant for the California State
16 agency, reviewed Plaintiff's medical records. (Tr. 141-149). Brodksy determined that, as
17 of September 30, 2003, in an eight hour day, Plaintiff could occasionally lift and carry 20
18 pounds, frequently lift and carry 10 pounds, stand and/or walk about six hours, and sit about
19 six hours. (Tr. 142). Plaintiff was restricted in his activities: he was limited to occasional
20 stooping, kneeling, crouching, balancing and climbing; he could not perform frequent
21 overhead reaching; and he should avoid concentrated exposure to extreme cold or heat,
22 wetness, humidity, vibration and hazards. (Tr. 145).

23 In September 2004, Jeffrey Levison, M.D., a medical consultant for the Arizona State
24 agency, reviewed Plaintiff's medical record. (Tr. 28, 150-157). Dr. Levison determined that
25 Plaintiff could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds,
26 stand and/or walk about six hours, and sit about six hours. (Tr. 151). Plaintiff could often
27 stoop, and occasionally balance, kneel, crouch and crawl. He could climb stairs and ramps

28

1  occasionally, but could never climb ladders, ropes or scaffolds. (Tr. 152). Plaintiff was able
2  to frequently lift at and below shoulder level, and should avoid concentrated exposure to
3  extreme cold or heat, wetness, humidity, vibration and hazards. (Tr. 153-154).

4  In October 2004, after Plaintiff relocated to Arizona, he sought treatment for his
5  diabetes at the Chino Valley Medical Center. (Tr. 176). Plaintiff reported that he had not
6  had laboratory tests for a year, had not been monitoring his glucose, and was taking
7  Neurontin. (Tr. 176). Plaintiff's gait, balance and motor strength were normal on
8  examination, and there were no focal signs. (Tr. 177). Plaintiff continued his treatment at
9  Chino Valley in 2005. (Tr. 162-173).

10  In October 2005, Plaintiff's physician at Chino Valley, Daniel Earl, D.O., stated that
11  Plaintiff was "completely unable to do" his occupation as a drywall finisher due to
12  polyneuropathy in his arms and legs. (Tr. 158). Dr. Earl further stated that while Plaintiff
13  remained mobile, his ability to carry out work-related functions such as lifting or standing
14  was impaired by nerve damage and limited by pain. (Tr. 158, 161).

15  Plaintiff testified at his November 28, 2005 hearing that he had diabetes and
16  neuropathy (nerve damages in his legs from diabetes) and that his shoulders were like
17  "mush." (Tr. 183). Plaintiff claimed sensory loss in his legs, sharp pains in his legs and
18  shoulders, lack of energy due to diabetes, pain in his fingers, and dizziness and fogginess
19  from his medication. (Tr. 183-184, 187). Plaintiff laid down 30 to 45 minutes three to four
20  times daily because of his pain and at times vomitted after taking Neurontin. (Tr. 187).
21  Plaintiff was able to perform limited housework, including washing dishes while leaning
22  against a counter, and separated his activities "time-wise" because Plaintiff could stand about
23  10 minutes maximum before having to sit down. (Tr. 188, 190, 193). Plaintiff was able to
24  walk 75 to 100 yards. (Tr. 190). When Plaintiff and his wife traveled by car to Southern
25  California, Plaintiff pulled over and walked around "to get the pain level down" every 75
26  miles. (Tr. 189). Plaintiff stated that he could lift 25 to 30 pounds if he merely lifted a
27  weight and set it back down. He could lift that weight throughout the day at different times,
28

1 but only if he separated the weight lifting. (Tr. 191). Plaintiff experienced pain in his
2 shoulder when he reached. (Tr. 191).

3 After Plaintiff no longer worked as a drywall finisher, he and his sons worked as
4 residential trash haulers. (Tr. 191-192). Plaintiff said that after June 1, 2002, he engaged in
5 trash hauling with his sons two to four times a week, on and off, until a couple of months into
6 2004, but was not doing so currently. (Tr. 192). Plaintiff moved from California to Arizona
7 in July 2004. (Tr. 193).

8 At the November 28, 2005, hearing, vocational expert Sandra Richter was asked to
9 assume that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, sit, stand,
10 and/or walk six hours in an eight-hour day, occasionally bend, crouch, crawl, kneel, never
11 climb ladders, ropes or scaffolds, occasionally climb stairs and ramps, and avoid overhead
12 reaching, extreme temperatures, hazards, and vibrations. (Tr. 195-196). Ms. Richter stated
13 that, based on the provided information, Plaintiff could work as a cashier, production worker
14 and packer, all light level jobs. Ms. Richter indicated that the numbers of available cashier
15 and production worker positions would be reduced by half because of Plaintiff's restrictions
16 on overhead lifting. (Tr. 196-197). Ms. Richter also stated that the severe pain indicated by
17 Plaintiff's treating physician, Dr. Earl, would prevent a person from working if the pain were
18 so severe that he could not complete a task. (Tr. 198-199).

19 **II. Legal Standard and Analysis**

20 Plaintiff bears the burden of proving that he is disabled. *Johnson v. Shalala*, 60 F.3d
21 1428, 1432 (9th Cir. 1995). He must prove that he was permanently disabled or subject to
22 a condition that was severe enough to disable him prior to the date upon which his disability
23 insurance expired. *Id.* Where the claimant establishes his inability to perform his previous
24 work, the burden shifts to the social-security commission to show that the claimant can
25 perform other substantial gainful work existing in the national economy. *Reddick v. Chater*,
26 157 F.3d 715, 721 (9th Cir. 1998).

27 The Court will overturn the Commissioner's decision to deny benefits "only if it is not
28

- 5 -

1 supported by substantial evidence or is based on legal error." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). Substantial evidence is relevant evidence that a reasonable mind "might accept as adequate to support a conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1457 (9th Cir. 1996) (quoting *Richardson v. Perales*, quotation omitted). In determining whether substantial evidence exists to support a decision, this Court considers the record as a whole, weighing both the evidence that supports the ALJ's conclusions and the evidence that detracts from the ALJ's conclusions. *Id.* If evidence can support either affirming or reversing the ALJ's decision, the court must uphold the decision. *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995). Reviewing courts cannot accept post-hoc rationalizations for agency action. *See, eg., NLRB v. Metro. Life Ins. Co.*, 380 U.S. 438, 441, 85 S.Ct. 1061, 1063 (1965); *Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001). Thus, the decision must be upheld, if at all, on the grounds articulated in the order by the hearing officer. *Pinto*, 249 F.3d at 847. The ALJ is responsible for resolving conflicts in medical testimony and ambiguities and for determining credibility. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995).

To qualify for disability benefits under the Social Security Act, a claimant must show: (1) he suffers from a medically determinable physical or mental impairment that can *either* be expected to result in death *or* that has lasted, or can be expected to last, for a continuous period of not less than twelve months; and (2) the impairment prevents him from engaging in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). The social security regulations set forth a five-step sequential process for evaluating disability claims. *Reddick*, 157 F.3d at 721; *see also* 20 C.F.R. § 404.1520. A claimant is not disabled if, at any point in the sequential process, a finding of not disabled can be made. 20 C.F.R. § 404.1520.

At step one of the sequential process, the hearing officer determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). So long as the claimant is not gainfully employed, the hearing officer proceeds to step two of

1 the analysis. At step two, the hearing officer determines, based on the medical evidence,
2 whether the claimant has a "severe impairment." C.F.R. § 404.1520(c). If the claimant's
3 impairment is "severe," the hearing officer proceeds to step three and determines whether the
4 impairment meets or equals any of the listed impairments in the regulations. 20 C.F.R. §
5 404.1520(d). If a claimant's combined impairments meet or equal a listed impairment, then
6 the claimant will be found disabled at step three without further inquiry. *Tackett,* 180 F.3d
7 at 1099. If not, the hearing officer will make a finding about the claimant's residual
8 functional capacity based on all the relevant medical and other evidence in record. 20 C.F.R.
9 § 404.1520(e). At step four, the hearing officer uses the residual-functional-capacity
10 assessment to determine whether the claimant can still perform "past relevant work." 20
11 C.F.R. § 404.1520(e). If the claimant can perform past-relevant work, then the claim is
12 denied. However, if the claimant is unable to do past relevant work, then the hearing officer
13 proceeds to the fifth step and determines, based on the claimant's age, education, work
14 experience and residual functional capacity, whether the claimant can perform other work
15 which exists in the national economy. 20 C.F.R. § 404.1520(f). If the claimant cannot, then
16 he is entitled to a finding of disability.

17 In this case, the ALJ concluded that Plaintiff was not disabled at step five of the
18 sequential-evaluation process after finding that, through the date he was last insured for
19 disability and disability insurance benefits, Plaintiff did not have an impairment that met or
20 medically equaled one of the listed impairments in 20 C.F.R. Part 404. The ALJ also
21 concluded that Plaintiff retained the residual functional capacity to perform a wide range of
22 light work activity. (Tr. 19). On appeal, Plaintiff argues that in reaching this conclusion the
23 hearing officer: (1) improperly rejected the evidence from his treating physicians; and (2)
24 improperly discredited Plaintiff's subjective pain testimony. As a result, Plaintiff argues that
25 the ALJ's findings are insufficient to support his conclusion that Plaintiff was not disabled
26 as of the date he was last insured.

**A. Treating Physicians**

Plaintiff argues that the ALJ improperly rejected the opinions of his treating physicians, Daniel Earl, M.D., and Julius Conner, M.D., even though their opinions were not directly controverted by another examining physician.

The opinion of a treating physician is not always dispositive. A hearing officer may rely upon the medical opinion of a non-treating doctor if he provides "specific" and "legitimate" reasons supported by substantial evidence in the record. *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001); *Fife v. Heckler*, 767 F2d 1427, 1431 (9th Cir. 1985).

While Dr. Conner's examination was not thoroughly discussed by the ALJ in making his determination, this Court finds that this is a non-issue because Dr. Conner's opinion is not inconsistent with the other non-treating physicians. Moreover, Dr. Conner does not provide his medical opinion, but instead relies on Plaintiff's subjective pain testimony, which the ALJ determined to be of limited credibility. (Tr. 19). Specifically, in his Doctor's Certificate for Plaintiff's Claim for Disability Insurance Benefits, Dr. Conner wrote that Plaintiff "states that he had to stop [drywalling] June 2002 due to severe shoulder pain. . .He states that he cannot stand for very long due to severe pain in legs." (Tr. 106). The ALJ agreed with Dr. Conner's assessment that Plaintiff could no longer perform his former occupation and did not reject his assessment, but focused on the objective medical evaluations of other physicians rather than rely on Dr. Conner transcribing Plaintiff's opinion regarding his ability to work. Dr. Conner's statements did not indicate that Plaintiff was incapable of performing any work, only that he could no longer work as a drywaller, which is supported by the objective medical record and acknowledged in the ALJ's decision.

The ALJ offered numerous reasons for rejecting Dr. Earl's opinion. Primarily, Dr. Earl's October 2005 examination did not address Plaintiff's condition during the relevant time period, prior to September 2003, when Plaintiff was last insured. Further, the ALJ found that Dr. Earl's opinion was not supported by the weight of the objective medical evidence in the record. The majority of medical evidence in the record suggests that

- 8 -

Plaintiff's symptoms were managed by his medication, and none of the physicians besides Dr. Earl (who discussed Plaintiff's condition three years after the relevant time period) stated that, in their medical opinion, Plaintiff physically was unable to perform all work-related tasks.

For example, in October 2002, Dr. Romine's examination found that though Plaintiff experienced shooting pains in his feet, his gait, station and coordination were normal and he had "significant benefit" from his current medication. (Tr. 123-124). In July 2003, Dr. Colson described Plaintiff as "a well-developed, well-nourished. . .Caucasian male in no acute distress." (Tr. 112). In December 2003, Dr. Riedler examined Plaintiff and found him to be "doing fairly well" on his medications and Plaintiff refused additional medication that might have further reduced his pain. (Tr. 120). On July 1, 2004, Dr. Brodsky's examination noted that Plaintiff "appeared partially credible. The findings did not fully support the allegations to a complete level of disability." (Tr. 149). Further, Dr. Brodsky opined that Plaintiff "should have been able to do light work with no reaching overhead on a frequent basis" prior to his date last insured. *Id.*

Not only did the vast majority of examining physicians consider Plaintiff's condition well-controlled by his medication, but the ALJ noted that Plaintiff worked as a trash hauler periodically between 2000 and 2004, which led the ALJ to infer that Plaintiff could have performed a light level of work after the alleged disability onset date. Also, Plaintiff sought medical treatment relatively infrequently, evidenced by Plaintiff's medical records, which led the ALJ to conclude that Plaintiff's pain was under control using his current medication. All of these factors provided by the ALJ constitute legitimate reasons for rejecting Dr. Earl's opinion and support the ALJ's determination that Plaintiff did not meet his burden of proving he suffered from a severe impairment rendering him incapable of all gainful employment.

### B. Plaintiff's Credibility

Plaintiff argues that the ALJ improperly discounted Plaintiff's credibility. An ALJ may not reject a claimant's testimony without specifically identifying the portions of the

- 9 -

testimony found not credible and explaining what evidence contradicts or undermines the testimony. *Aukland v. Massanari*, 257 F.3d 1033, 1036 n. 1 (9th Cir. 2001); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001); *Reddick*, 157 F.3d at 722. An ALJ's credibility determination must be supported by specific cogent reasons and the evidence relied upon to reject the testimony must be "substantial." *Aukland*, 257 F.3d at 1036 n. 1; *Reddick*, 157 F.3d at 722.

Under the threshold test for a plaintiff's subjective symptom testimony, as announced in *Cotton v. Bowen*, 799 F.2d 1403 (9th Cir. 1986), the claimant must: (1) "produce objective medical evidence of an impairment or impairments;" and (2) "show that the impairment or combination of impairments *could reasonably be expected to* (and that it did it fact) produce some degree of symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original). The latter prong of the test does not require evidence of a causal relationship between the medically determinable impairment and the alleged symptom or that the impairment could reasonably be expected to produce the severity of symptom alleged. *Id*.

If the claimant meets the *Cotton* test, and no evidence shows malingering, in order to reject testimony regarding the severity of symptoms, the ALJ must specifically state clear and convincing reasons and specify which symptom testimony is not credible and what facts support that conclusion. *Id*. at 1284. In doing so, the ALJ may consider the claimant's reputation for truthfulness or untruthfulness; any prior inconsistent or less than candid statements; unexplained or inadequately explained failure to seek or follow a course of treatment; and claimant's daily activities. *Id.* The ALJ must also consider the claimant's work record; observations regarding the nature, onset, duration and frequency of symptoms by treating and examining physicians; triggering and aggravating factors; and functional restrictions and symptoms. *Id*.

The ALJ found that Plaintiff's testimony regarding the intensity, duration and limiting effects of his symptoms was not fully credible. (Tr. 19). Plaintiff's April 2004 disability report, in which he states that he worked as a residential trash hauler from February 2000 to

1 June 2002, was inconsistent with his testimony that after June 2002, he continued to work
2 a trash hauler two to four times a week until early 2004. Due to this inconsistency, the ALJ
3 inferred Plaintiff was capable of at least light work activity prior to and as of September,
4 2003. The ALJ further questioned Plaintiff's credibility because he failed to report his
5 income between 2000 and 2002, though Plaintiff testified that he worked as a trash hauler
6 during that time period. The ALJ noted that Plaintiff unlawfully neglected to report his
7 income and now seeks government benefits that are provided by federal deductions from
8 reported earnings. (Tr. 20).

9 The ALJ found that the objective medical evidence relevant to the time period
10 Plaintiff was last insured suggests that Plaintiff's medical condition would not have
11 prevented him from performing the requirements of sedentary or light work with restrictions.
12 In fact, the record shows Plaintiff worked as a trash hauler, a physically demanding
13 occupation, during this time period. Not only was Plaintiff able to work during the relevant
14 time period, but there is also substantial evidence in his medical records that he responded
15 well to his medication and his pain was reduced by 70%. Further, Plaintiff did not seek
16 treatment after his December 2003 neurological consultation until October 2004. The ALJ
17 inferred from this gap in treatment that Plaintiff's condition was relatively well controlled
18 by medication, because he could function for nearly a year without seeking additional
19 medical treatment.

20 The ALJ in this case made specific findings, based on evidence in the record, that
21 support his credibility determination. Therefore the Court finds that the ALJ was justified
22 in inferring from the objective medical evidence and Plaintiff's own testimony concerning
23 his trash hauling occupation that Plaintiff's complaints about the extent of his limitations
24 were not entirely credible.

25 **III. Conclusion**

26 The ALJ properly considered the evidence of whether Plaintiff was disabled as of his
27 last date insured. The ALJ provided specific, legitimate reasons for rejecting the opinion of

28

- 11 -

Plaintiff's treating physician, Dr. Earl, which were supported by substantial evidence on the record. While the ALJ did not discuss in detail Dr. Conner's opinion, this is a non-issue because Dr. Conner's opinion was consistent with other non-treating physicians. Further, Dr. Conner's opinion was based on Plaintiff's subjective pain testimony, which the ALJ determined to be of limited credibility due to Plaintiff's inconsistent description of his employment. Plaintiff has not met his burden of proving he suffered from a severe impairment as of his last date insured. Consequently, Plaintiff's Motion for Summary Judgment will be denied and the Commissioner's Cross-Motion for Summary Judgment will be granted.

**IT IS ORDERED** that Defendant's Cross Motion for Summary Judgment (Doc. #14) is GRANTED;

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. #7) is DENIED.

**IT IS FURTHER ORDERED** that the Clerk of Court shall issue judgment accordingly and that the judgment shall be the mandate of the Court.

DATED this 26th day of July, 2007.

_____
James A. Teilborg
United States District Judge